Thomas Alan ROBINSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–81–00121–CR.

Court of Appeals of Texas,
San Antonio.

June 15, 1983.

Discretionary Review Refused
Nov. 2, 1983.

David K. Chapman, San Antonio, for appellant.

Bill White, Dist. Atty., Keith Burris, Susan D. Reed, Douglas C. Young, Linda S. McDonald, Asst. Dist. Attys., San Antonio, for appellee.

Before CADENA, C.J., and BUTTS and DIAL, JJ.

## OPINION

BUTTS, Justice.

Appellant was convicted of murder. Tex. Penal Code Ann. § 19.02(a)(1) (Vernon 1974). Finding appellant guilty after a bench trial, the court assessed punishment at fifty (50) years imprisonment.

Asserting nine grounds of error, appellant claims: that the State and the trial court coerced him into waiving his right to a jury trial by making the risk of death the price of asserting the right; that error occurred when the court overruled his objection to the record and when the court refused to conduct a hearing thereafter; that the evidence is insufficient to support the conviction; that the evidence failed to prove the indictment's allegation of the means of death by slashing the complainant's throat; that fundamental defect exists in the indictment, and; that the trial court erred in overruling his motion for discovery. We do not agree with these contentions and affirm the judgment.

■ Was appellant coerced by the State and trial court to waive his right to a jury trial? Originally appellant was indicted for capital murder. The record discloses that subsequent plea negotiations brought the case to trial based upon an information. Tex.Code Crim. Proc. Ann. art. 1.141 (Vernon 1977). Murder is a lesser included offense of capital murder, and the State may reduce the charge to that offense. *Ex parte McClelland,* 588 S.W.2d 957, 959 (Tex. Cr.App.1979). In the present case plea negotiations led to the reduced offense of murder; the appellant does not argue that he desired to be tried for capital murder. He says he did not want to face the death penalty, however, he also desired and should have had a jury trial on the murder charge. Thus, he contends, he gave up his valuable right to a jury trial because of coercion.

■ The defendant in a noncapital case has the constitutional right under the United States Constitution and the Texas Constitution to a trial by jury. Any waiver of that right must be voluntarily and intelligently made to be valid. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). The Supreme Court has held this to be a fundamental right to which the voluntary and intelligent waiver standard will apply. *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 279 (1969). An effective waiver of the constitutional right must be an intelligent act done with sufficient awareness of the relevant circumstances and the likely consequences. *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747, 756 (1970). *Martinez v. State,* 555 S.W.2d 462, 463 (Tex.Cr. App.1977); arts. 1.13, 1.14, 1.15.

Appellant testified he decided to waive the jury trial and not take a chance on the death penalty. His counsel advised him he had a right to a jury trial, but if he waived that right, he would be tried for murder and not capital murder. The prosecutor agreed the reason for reducing the case to "straight murder" was in exchange for waiving the jury trial.

■ Initially we point out that the ways in which prosecutors choose to conduct their plea negotiations are generally within the discretion of the prosecutors. If the prosecutor chooses not to be sufficiently persuasive in making his offer, or if he makes no offer at all, the defendant is equally without legal recourse. *Quinones v. State,* 592 S.W.2d 933, 941 (Tex.Cr.App.1980).

■ The Supreme Court has distinguished between a State's retaliation against a defendant for exercising a valid legal right, and the "give-and-take" negotiations common in plea bargaining between the prosecution and the defense. In the

latter instance, there is no forbidden element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer. That Court wrote in *Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 668, 54 L.Ed.2d 604, 612 (1978),

> Plea bargaining flows from 'the mutuality of advantage' to defendants and prosecutors, each with his own reasons for wanting to avoid trial. . . .
>
> \*    \*    \*    \*    \*    \*
>
> While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights,' the imposition of these difficult choices [is] an inevitable . . . and permissible 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'

Although in this case all agreed the plea negotiations took place in the trial judge's chambers, we find nothing in the record to indicate the trial judge entered into the discussions, nor does appellant allege that he did. There is no evidence that appellant could not have rejected the offer. Appellant's waiver of a jury trial was freely and voluntarily given as a result of plea negotiations. This was his free choice in response to prosecutorial persuasion. Grounds of error one and two are overruled.

Error is next urged for failure of the trial court to order included in the instant transcript the indictment, motions and any other documents in the capital murder case which would have been required to be included in the transcript had that case been prosecuted and appealed. Tex.Code Crim. Proc.Ann. art. 40.09(1) (Supp.1982–83).

Appellant timely objected to the record in the murder case, calling the attention of the court to the omission of those instruments, art. 40.09(7). The trial court conducted a hearing but did not order the instruments to be included in the record.

■ It is clear that appellant did not seek to introduce the indictment or the other instruments from the abandoned case into evidence at any time. Nor did he designate any of those instruments to be included in the record. (art. 40.09(1)) *Compare Aguilar v. State,* 621 S.W.2d 781, 786 (Tex.Cr.App. 1981). Since he did not affirmatively pursue these methods to secure inclusion of the papers, our primary question is whether the trial court abused its discretion by its refusal to so supplement the record. This was a court trial. Everyone knew of the previous capital murder indictment and what had transpired to bring appellant before the same court on a reduced charge of murder. This court has the statement of facts with defense testimony at the hearing for a new trial outlining the plea-negotiations which culminated in the bench trial. We perforce know of the capital murder indictment and ancillary matters regarding that case. We find appellant has not shown how he has been harmed by failure to include the documents in this record. *See, e.g., Zanders v. State,* 480 S.W.2d 708 (Tex.Cr.App.1972). We hold the trial court did not abuse its discretion and overrule ground of error three.

■ By his fourth ground of error appellant complains that a hearing was not held after he objected to certain words in the supplemental record. The record discloses there were two hearings following objections to the record after its completion pursuant to article 40.09(7). Certain additions had been made as reflected in the "Supplemental Record." However, one particular objection to the supplemental record was overruled, and the trial court conducted no further hearings on the matter.

From the hearing on the amended motion for new trial, a portion of the recorded testimony is, ". . . this is *one of the occasions* when [the plea bargaining to reduce the charge and waive a jury trial] came up." Appellant's written objection stated this should read, ". . . this is *the occasion* . . ." The court reporter verified he had erased his "back-up" tape of the testimony. The court overruled the objection. Apparently, appellant believes this to be material because it intimates that plea negotiating occurred in several places, not just in the trial judge's chambers on the day before

trial. We find nothing in the record to indicate otherwise. In fact, affidavits of two attorneys set out "... this is the occasion" version. Further, the fact that plea negotiations occurred in the judge's chambers was not contested by the State. Given these circumstances, we find the trial court did not err in declining to hold a further hearing following this objection. *See Grundstrom v. State*, 456 S.W.2d 92 (Tex. Cr.App.1970).

We now address two challenges to the sufficiency of the evidence to support the conviction, ground of error five as to the evidence generally and ground of error six as to corroboration of accomplice testimony. Because they closely intertwine and overlap, they are best considered together.

The record shows four young men met at "roadside" on August 5, 1976, around 8:30 p.m. in San Antonio. To meet at this particular roadside park on north San Pedro to drink, smoke "grass" [marihuana], and "party" was customary. The four were Pat Garrett, Phil Murphy, Ronnie Starrett, and appellant, Thomas Robinson. These four, who had known each other since grade school, were still there when the deceased, seventeen year old Lorie Guerra, arrived around midnight. Starrett, who lived at the same mobile home park on north San Pedro as she, had once been her boyfriend. They all agreed she was "high" on something when she arrived and that she consumed drinks after that.

The party moved to the mobile home park at Lorie's invitation, where they "skinny-dipped" in the swimming pool until a security guard ordered them to leave because of residents' complaints. He testified the time was about 2:00 a.m. Then the party moved to Murphy's house in Hollywood Park. There Murphy, Starrett, and Lorie swam in the pool. Garrett and the appellant sat by the side of the pool and drank. The swimmers argued; Murphy tried to urinate on the girl. Suddenly Lorie began screaming, crying, and yelling obscenities, cursing Murphy and Starrett and throwing a bottle at Starrett. Mr. Murphy came from the house and told them to be quiet or to leave. Lorie grabbed her clothes and ran from the yard, seemingly hysterical.

Down the street three teenagers encountered her. Two of them testified she was screaming and crying, one saying she told her that Murphy had tried to rape her. They drove her home and said the time was around 3:00 a.m.

Annette Stokes, a teenager living at the park, testified she received a telephone call from Lorie at 3:40 a.m. Lorie was upset and wanted to go to south San Antonio after the two sat in Stokes' car a few minutes later. Stokes offered to take her to the police to report the complained-of offense. Becoming angry, Lorie jumped from the car and dashed into the highway. Stokes, fearing for her safety, drove alongside the crying girl who refused to enter the car. Stokes saw the four young men at "roadside." She knew Starrett and believed he might control Lorie.

After Lorie left the Murphy backyard earlier, the four had returned to the roadside park to jump-cable Murphy's 1953 pickup, having left it there. Garrett and appellant arrived in Garrett's 1964 Olds, and Murphy drove his father's green Blazer with Starrett as the passenger. Starrett and Murphy first drove through the mobile park up to the mini-storage located on the property. The same security guard told them to leave, and they drove to the roadside park. The other two were already there.

From Stokes they learned that Lorie was "running around out on the highway," and Starrett left with her. The testimony is undisputed that all of the young men were "drunk" and continued drinking all night. Starrett stated that Lorie pushed him down and cursed him, so he left with Stokes and went home. Stokes asked the security guard and her brother-in-law to help get Lorie off the highway, but they refused. She said it was about 4:30 a.m. when she got Lorie's mother to accompany her on a fruitless search of the area. She was positive that the time when they returned was about 5:15 a.m. Stokes remembered that at

"roadside" the appellant had told her he would get Lorie and take care of her.

Back at "roadside" the pickup started and Murphy left in it. Garrett drove his Olds, and appellant drove the Blazer. Appellant testified he saw the girl on the highway and parked at an Exxon station to wait for her to walk by. He said Garrett first tried to get her into his car, but she refused, and Garrett drove away. He also stated he told Garrett he would go to the "cliffs" and for the others to join him there. [The "cliffs" was another secluded area frequented by partying young people, located on a dirt circular road off Highway 1604]. Shortly before that he testified he told them they should "take her home and see if she wants to party." At trial Garrett denied that anything was said about meeting at the "cliffs." He was confronted by the defense with his conflicting testimony at the examining trial that appellant did mention meeting him at the "cliffs".

The testimony of another witness, Jean Tanafoca, one of the young persons who drove the deceased to her house from the Hollywood Park, differed from that of her companion, Frank Fitzpatrick, who reported seeing Garrett and Murphy in the white Olds about 5:00 a.m. driving through the streets of Hollywood Park. She said that she and Fitzpatrick left for the Texas coast at "4:00 to 4:30 a.m." that morning.

Appellant testified he had no problem getting Lorie into the Blazer, where she promptly asked for a "joint" [marihuana]. They cruised around and went to the "cliffs" where they smoked another "joint". She became upset, telling him she was going "to get Starrett and Murphy killed." She got mad and "started swinging at me and stuff." They had alighted from the Blazer. He said he tried to block her swings and he finally hit her. She continued swinging at him, and he hit her "a couple of more times," popping her in the mouth, he said. He got into the Blazer, and when she ran over to him, he kicked her in the face. He said he left then and she was still alive.

He stated he drove to the Murphy house about 3:30 a.m. and the others were not there. [Stokes related she was with the deceased after 3:40 a.m. and saw the appellant with the others after that time at "roadside." This coincides generally with the testimony of the time sequence by Garrett and Murphy, as well as the security guard's statements.] Appellant said that at the swimming pool he jumped in wearing only pants, climbed out, and went to sleep for an hour or hour and a half. He awakened, got in the Blazer, which he left in the driveway, and drove to find Garrett and Murphy. He met the Olds in Hollywood Park and they proceeded to Murphy's house. In the Olds, he said, they headed to Garrett's apartment but decided to go to the "cliffs" first when he told the two others about leaving Lorie there. They saw a body by the dirt road, drove slowly past, but did not stop. Back at the house, they all cleaned blood from the side of the Blazer and wiped spots of blood from the Olds, using appellant's T-shirt and a towel.

They then went to Garrett's apartment where appellant was also living temporarily, drank more beer, sang songs and went to sleep. Appellant remained there when Garrett and Murphy went back to Murphy's house around 11:30 a.m. Garrett and Murphy were then confronted by police investigators, and they both gave statements. Murphy's father found evidence of blood on his Blazer; it and the Olds were impounded by the police.

Garrett testified that the plan was to meet at Murphy's with the three vehicles after leaving "roadside." He and Murphy waited thirty to forty-five minutes for appellant; when he did not arrive, they drove in the Olds through Hollywood Park and a neighboring community and down San Pedro. They stopped at an icehouse for cigarettes. Heading toward Murphy's house they met the Blazer. His testimony was that appellant said he was all wet, and he had to get some blood and dirt off himself, that he got it from Lorie. He remembered appellant's announcement that, "That bitch won't be bothering anybody anymore." Garrett stated the appellant told them he

used brass knuckles to hit Lorie, that she was "getting on his nerves." He said he "slit her throat with a razor blade." Garrett wanted to "check it out with Phil" to see if appellant was telling the truth. He recalled appellant said the wound on his foot resulted when he kicked Lorie, and he thought a piece of her tooth was lodged within. Appellant explained a picture of the wound at trial as a mosquito bite. Garrett testified appellant said he grabbed her hair and slit her throat and he had backed the Blazer over her again and again.

There was evidence from appellant's roommate that appellant carried razor blades in his wallet, but appellant stated he carried only the one that he had used in a suicide attempt. Murphy, who "passed out" in the Olds when they drove to the "cliffs," remembered that appellant told them he had intercourse with the girl before killing her. The evidence showed death resulted from severe head injuries; the lips and face reflected a severe beating; lacerations were apparent on the throat and head. The position of the body indicated it had been moved from one place to another; there were pools of blood, and the hair was blood soaked. Several officers confirmed the area had great amounts of blood over it.

While scientific investigators from the San Antonio Police Crime Laboratory discovered evidence of blood on the outside of the Olds and on the lower left parts, they found none in front and none underneath the automobile. They did find a large amount of dirt impacted underneath which was undisturbed. The Olds was a "low rider," sitting six to eight inches off the ground. They found no hair, no flesh particles and no blood directly underneath. One officer opined the tires "slung" blood up and spattered the left side of the Olds as it was driven through a pool of blood.

However, examination of the Blazer revealed evidence of dark hairs on the door, the right rear shock, and the underside of the gas tank at the rear. Blood stains on the Blazer were located on the bottom of the gas tank, on the rocker panel underneath the vehicle, under the left front and

rear tires, on the rear end housing, on the tailpipe, as well as a large amount of blood on the rocker panel and "smeared" blood all underneath. There were dark hairs entangled in the U-joint. Testimony from the officer who interpreted the scientific tests on this evidence indicated the bloody streaks and smears on the rear end axle and other underneath parts were consistent with marks which would be made by blood-soaked long hair. His examination of the victim's body at the scene indicated that she had been run over and over through the grass. The hair and blood samples recovered from the Blazer were found to be consistent with those taken from the deceased. The Blazer thus was determined to be the death vehicle. The marks on the body were consistent with those which would result from being run over and over by a vehicle.

■■■ This is a circumstantial evidence case. We will review the evidence in the light most favorable to the decision of the trial court. See Seaton v. State, 564 S.W.2d 721, 724 (Tex.Cr.App.1978) and cases cited therein (jury verdict). A conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused. Easley v. State, 529 S.W.2d 522, 524–525 (Tex.Cr.App.1975). It is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. Flores v. State, 551 S.W.2d 364, 367 (Tex.Cr.App. 1977). The hypothesis that the act may have been committed by another person is one that the circumstances to a moral certainty are not required to exclude, but it is necessary that the hypothesis intended is a reasonable one consistent with the circumstances and facts proved, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. Flores, supra, at 367. See Nathan v. State, 611 S.W.2d 69, 75 (Tex.Cr.App.1981). In a circumstantial evidence case the reviewing court will not presume any acts against an accused that

are not shown to have been committed by him. *Nathan, supra* at 75.

■ Because the basis of this court's ruling on a sufficiency challenge would be incomplete without consideration of accomplice questions, we now move to ground of error six which challenges the sufficiency of the evidence to corroborate the testimony of accomplice witnesses. Appellant raises the accomplice question for the first time on appeal. In *Ex parte Reynolds*, 588 S.W.2d 900, 902 (Tex.Cr.App.1979) the court wrote:

In this jurisdiction, when the evidence is insufficient to corroborate an accomplice witness, the jury cannot properly return any verdict except an acquittal. We therefore hold that the *Burks* [*v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1]-*Greene* [*v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15] rule does apply to cases in which the evidence is insufficient to corroborate the testimony of the accomplice witness.

By virtue of the holding in *Reynolds, Id.,* we find this is a proper question to review on appeal because it goes to sufficiency of the evidence.

■ We must determine first whether Garrett and Murphy were accomplice witnesses. An accomplice witness is someone who has participated with another before, during, or after the commission of a crime. *Russell v. State,* 598 S.W.2d 238, 249 (Tex.Cr.App.1980); *Villarreal v. State,* 576 S.W.2d 51, 56 (Tex.Cr.App.1979). One is not an accomplice witness who cannot be prosecuted for the offense with which the accused is charged. *Russell v. State, supra; Villarreal v. State, supra; Easter v. State,* 536 S.W.2d 223, 227 (Tex.Cr.App.1976). A witness is not deemed an accomplice witness because he knew of the crime but failed to disclose it or even concealed it. *Russell v. State, supra; Villerreal v. State, supra; Easter v. State, supra.* Further, it is well settled that mere presence at the scene of the offense does not compel the conclusion that the witness is an accomplice witness. *Russell v. State, supra; Easter v. State, supra.*

The evidence is clear that Garrett and Murphy were with the appellant the evening before the commission of the offense. They accompanied appellant to the gruesome scene at the "cliffs," and the evidence shows they returned to Murphy's house bent on ridding the Blazer of bloodstains and generally covering up evidence of the killing. They all went to Garrett's apartment after wiping blood off the Blazer and the side of the Olds. Murphy and Garrett did not report the offense. Their actions, although not commendable, did not make them accomplices.

When confronted by the investigating officers in the case on the same day, Garrett and Murphy went to the police station and each of them gave a statement. As a result of the investigation, an arrest warrant issued for appellant. Garrett and Murphy have not been charged in this case.

Further, Garrett and Murphy remained together during the time that appellant was gone in the Blazer. In addition to their testimony, a teenager who lived near Murphy testified that he saw them in Garrett's Olds driving through the streets of Hollywood Park. They each testified they were searching for appellant who was in the Blazer at that time. When they saw the appellant in the Blazer again the time was about 5:00 a.m. A deputy sheriff testified he saw the headlights of a vehicle exiting from the dirt road. He drove there and found the body about 5:35 a.m. He testified the body was still warm.

The trial court in this case was the trier of facts, judging the credibility of the witnesses and the weight to be given their testimony. The court was free to accept or reject the testimony of any witness. *Limuel v. State,* 568 S.W.2d 309, 311 (Tex.Cr.App.1978). By his decision he indicated he believed witnesses other than appellant.

■ In applying the law to the facts of this case, we find that Garrett and Murphy were not accomplices as a matter of law. Nor does the evidence show they were accomplices as a matter of fact. However, assuming they were accomplices, we find

there was sufficient evidence to corroborate their testimony. It is well established that a conviction cannot be based upon the testimony of accomplices unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the offense was committed. *Hernandez v. State,* 578 S.W.2d 731, 732 (Tex.Cr.App.1979); art. 38.-14. The test to apply is to eliminate the accomplice testimony from consideration, and if there is other incriminating evidence tending to connect the accused to the commission of the offense, there is sufficient corroboration. *Hernandez,* 578 S.W.2d at 732. That he was driving the Blazer and that he physically abused the deceased after taking her to the scene of her death, facts of his own testimony, tend to connect appellant to the commission of the offense. Other matters to consider were evidence of bloodstains and hairs found underneath the Blazer, the testimony that appellant carried razor blades in his wallet, and the evidence that there were lacerations on the deceased's throat. We find there was sufficient evidence to sustain the conviction and overrule grounds of error five and six.

Appellant next asserts the evidence is insufficient to prove a material allegation in the information, namely, that appellant caused complainant's death by slashing her throat with a razor blade. The information states, in pertinent part:

THOMAS ALAN ROBINSON did then and there intentionally and knowingly cause the death of an individual LORRAINE R. GUERRA by slashing complainant's throat with a razor blade and by striking complainant with a motor vehicle; . . .

It has always been the rule that an indictment (or information) which charges an offense to have been committed by more than one method is sustained by proof of any one of the methods alleged. Evidence may be offered of all the methods (or causes of death), and if any one is proved, it is sufficient. *Dovalina v. State,* 564 S.W.2d 378,

381–83 (Tex.Cr.App.1978), citing many cases with examples.

We have earlier held that the evidence in this case is sufficient to support the conviction. We now hold the allegation that death was caused by striking complainant with a motor vehicle is sufficiently supported by probative evidence. Accordingly, we overrule the seventh ground of error.

Appellant contends in ground of error eight the information is fundamentally defective because it fails to allege the manner and means used to kill Lorraine R. Guerra. He argues he is charged with causing Guerra's death and, in addition, he is also charged with committing certain acts against some "complainant." While the better practice would have been to name the complainant as Guerra, we do not consider this to be the kind of defect, subject to a motion to quash, as in *Brasfield v. State,* 600 S.W.2d 288, 302 (Tex.Cr.App.1980). In that capital murder case it was noted a kidnap victim may be a different person than the deceased. In the instant case it is not a logical conclusion that Guerra's death could be caused by slashing another's throat or striking another with a motor vehicle. There was only one victim involved. There is no fundamental error. *American Plant Food Corp. v. State,* 508 S.W.2d 598, 603 (Tex.Cr.App.1974). Further, the information is couched in language which would give the appellant notice of the particular offense with which he was charged. Tex. Code Crim.Proc.Ann. arts. 21.23, 21.11 (Vernon 1979). We overrule the contention.

Appellant alleges error occurred when the trial court overruled his motion for discovery of certain evidence; specifically he complains of the failure to compel production of "one pair of men's green pants which are believed to have bloodstains and which were confiscated in furtherance of the investigation of the . . . cause." Appellant moved for this disclosure after the State rested and before the defense presented its evidence. Appellant argues on appeal that the scientific tests on the pants showed no bloodstains on them. He denied ownership of the bloodstained

blue jeans introduced by the State as the pants worn by him at the time of the commission of the offense. Therefore, he further argues, his defense would have shown the blue jeans were not his and the pants actually worn by him on the fateful night had no bloodstains on them [the green pants]. At the motion hearing:

> DEFENSE COUNSEL: It has come to our attention through one of the statements that we've been presented from the district attorney that there is a pair of green pants allegedly belonging to the defendant ... that was confiscated or picked up and lab reports were made on this wearing apparel item ...
>
> THE COURT: All of the witnesses that were subpoenaed, were they not, were here and made available to the defense.
>
> DEFENSE COUNSEL: Yes, your honor ...

A motion for discovery must demonstrate good cause, materiality, and that the State has possession of the item sought. *Hoffman v. State,* 514 S.W.2d 248, 252 (Tex.Cr. App.1974). Tex.Code Crim.Proc.Ann. art. 39.14 (Vernon 1979). The record shows no other reference to the green pants, either by the State or by the defense. Appellant's testimony was that he wore *grey* Exxon pants that night. There is no laboratory report in evidence which mentions green pants. The person who tested all the clothing for bloodstains was a witness, as was the officer who took appellant's clothing from his apartment on the day of the offense. The defense did not question them about green pants belonging to appellant.

Moreover, the statement which provided this information to the defense counsel was not placed in evidence. There is no showing that the State or any State agency had possession of a pair of green pants. *Thompson v. State,* 612 S.W.2d 925, 928 (Tex.Cr.App.1981). There is no showing of the actual existence of the item. *Hoffman,* 514 S.W.2d at 252. *See Brem v. State,* 571 S.W.2d 314, 321–22 (Tex.Cr.App.1978). Three elements of art. 39.14 must be shown by a movant: good cause, materiality, and possession by the State. Appellant did not

meet the burden in this case, and the trial court correctly denied the motion for discovery. The ninth ground of error is overruled.

The judgment is affirmed.