**Janet Lynn KEECH, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 13–85–317–CR.**

Court of Appeals of Texas, Corpus Christi.

Feb. 27, 1986.

George Scharmen, San Antonio, for appellant.

Edward F. Shaughnessy, III, Asst. Dist. Atty., San Antonio, for appellee.

Before NYE, C.J., and BENAVIDES and SEERDEN, JJ.

## OPINION

BENAVIDES, Justice.

Appellant was convicted of murdering her husband and was sentenced to sixty years' imprisonment in the Texas Department of Corrections. We affirm appellant's conviction.

Appellant asserts six grounds of error on appeal, claiming: (1) the trial court erred in refusing appellant's requested charge on accomplice witness testimony as a matter of fact; (2) the court erred in refusing to charge on accomplice witness testimony as a matter of law; (3) the evidence was insufficient to prove the offense charged; (4) the court erred in refusing to charge on the lesser included offense of voluntary manslaughter; (5) the court erred in overruling appellant's objections to "have you heard" questions posed by the State; and (6) the court erred in overruling appellant's objection to the introduction of a handgun demonstration conducted by the State's witnesses.

At approximately 2:00 a.m. on October 17, 1983, police answered a call regarding a possible burglary at a residence in Live Oak, Texas. Upon entering the residence, the officers found the body of James Keech on the floor of the master bedroom, face down, apparently shot in the back of the head. Medical technicians, called to the scene at approximately 2:30 a.m., observed rigor mortis and livor mortis in the body, and thus made no effort to revive the victim. The call to police had been placed by the Keeches' neighbor, where appellant and her children were located during the bur-

glary investigation. Shortly thereafter, the police and medics informed appellant of her husband's death.

Appellant gave two written statements regarding the events of the evening. In her first written statement, taken on October 18, 1983, appellant stated that on October 16, 1983, she and her husband closed their place of business, The Starlight Lounge, sometime between 8:30 and 9:00 p.m. They then went to dinner and arrived home to find their son Jimmy watching "Galligar" on T.V. and their other two children, Stephanie and David, asleep in David's room. Appellant's statement continued as follows:

I walked in, I told Jimmy to go to bed, checked the sliding glass door to see if it was locked. I also turned off the lights in the spare bedroom. I don't recall if the side door was locked. I then went into my bedroom, placed my purse in the closet and I think I placed the money bag on the ironing board which is in our bedroom. Jim went into the living room, took off his boots and began watching T.V.

I started to make a pot of coffee and then went to put on my robe. I then watched a little of Galligar on T.V. and had a cup of coffee.

I then decided to go to bed, Jim stayed watching T.V. I layed down on our bed. But then I had to take some Malox, then went to the bathroom. I then went to my daughter's bedroom. I may have had a cigarette, but am not sure. I layed down for a while. When I left the room a short time late (sic) Jim was asleep in his chair, wearing only his under shorts and M.A.S.H. was on T.V.

I woke him up, he got a glass of water for himself and I got a glass for myself. We went back to the living room talking, it was about the ballgame and about Pete's party. Jim was also having trouble with his stomach and went to the bathroom. Then we went to our bedroom.

Later I got up again to get a glass of water. I checked the alarm and it was

after 1:00 a.m. As I was leaving the room after opening the door I heard a noise. It was a noise that I can't describe. It was not the noise of the door opening. I recognize that door sound because that door sticks. I told Jim that I heard a noise. Jim was laying down. He got up and began reaching for his gun. He keeps it in the drawer of the water bed sometime (sic) and other times it's on the night stand. I don't remember exactly what he was doing. He told me to get the children and wait until he called me. The best I recall he said "get the children." I ran down the hall to Jimmy's bedroom, the older boy. I dragged him from his room to David's room which is across the hall. I recall seen (sic) Jim standing in front of our bedroom. We all barracaded ourselves in David's room, Stephanie, David, Jimmy, our dog and myself. About 30–40 minutes later, we all climbed out through the window and went next door to Lupe and Carol Yount. While we were in David's room we didn't hear any shot. We heard some noises but I can't say what it was. After we had been in David's room for about 15 minutes, we looked out the window. I remember seeing two cars that belong to my neighbors, the Smiths. I thought I saw a silhouette of a person along the Smith's back fence by the sign "Dead End." I mentioned to the kids that I saw one (sic) one.

Later the police arrived at Lupe's house. We told him what was going on and after they went into my house to look for my husband. The police kept asking me to stay at Lupe's house. Shortly thereafter Live Oak Rescue, then an ambulance arrived. Finally I was told by a lady from S.A.F.E.S. that my husband was dead.

On November 1, 1983, appellant gave the following statement:

On Oct. 18, 1983 I voluntarily gave a written statement to Texas Ranger A. Cuellar reference (sic) the death of my husband James Keech. Everything I said in that statement was correct how-

ever I failed to say that Herbert Reil, a friend of mine, had been at my house on Oct. 16, 1983. I believe that M.A.S.H. was on T.V. so it was probably between 10:30 p.m. and 11:00 p.m. when Herb came to our house. I don't know when he left.

The next morning, after my husband's death Herb called me at Minnie Mauger's house. He asked me not to tell the police about him being there because he had been in the penitentiary before and because of all the trouble Herb had with James.

Officer Adolfo Cuellar testified at trial that at the time of taking appellant's first statement, he specifically asked her if anyone had been at her house on the evening of October 16, and she responded "Not that I know of." Between October 18 and November 10, 1983, Cuellar continued the investigation with Officer Gary Hopper. During that time, they determined someone had visited the Keech home on the evening of October 16. They knew that a vehicle had been there shortly after midnight, knew the identity of the person in possession of the vehicle, and had been told that person was a friend of appellant's. When confronted again on November 10, appellant admitted that Herbert Reil had been at her home on the evening of her husband's death, but "didn't think anything wrong with it at the time" to withhold Reil's name from the police.

At trial, the State utilized Reil's testimony in its case in chief. Reil testified that he and appellant had been involved in an adulterous affair; that she had asked him to come over to her house around midnight on the night of the incident[1] and that he was at her house at 12:10 a.m. on October 17, 1983. Reil testified that when he arrived at the Keech residence the appellant greeted him, appeared upset, showed him the body of her husband, asked him to get rid of the murder weapon, and said she would make the shooting look like a burgla-

ry. Reil testified on direct examination that appellant said her husband had gotten angry, they had fought over the gun, and she had shot and killed him, but refused his suggestion to call the police to report the shooting as an accident. Reil stated that appellant wrapped the gun in a towel, said that she had wiped her fingerprints off the gun and wanted him to get rid of it. Appellant told Reil that she would give him 15 minutes to get on his way before she called the police. Reil testified that he took the murder weapon, wrapped in a towel, and left the Keech residence. On his way home Reil "threw the gun off the [I.H.] 35 bridge into the Guadalupe River." He stated that appellant contacted him a week later and told him that he had nothing to worry about because "the police did not suspect anything and felt the police would not solve the murder." The murder weapon was never recovered.

Reil denied calling appellant at Minnie Mauger's house, and stated he only knew the lady by name and did not know her phone number. Appellant said that Reil had called her at Mauger's house, but also said that she did not talk to him on October 16th and that he would have had no way to have known she was at Mauger's house. Appellant denied ever dating Reil or having sexual relations with him.

In her first and second grounds of error, appellant claims that the trial court erred in refusing to submit to the jury requested charges on Herbert Reil as an accomplice witness as a matter of fact or as a matter of law. We find nothing in the record which indicates that the trial court was required to instruct on whether Reil was an accomplice witness.

 An accomplice witness is someone who participated with another before, during or after the commission of a crime; one is not an accomplice witness who cannot be prosecuted for the offense with which the

---

1. In his written statement, Reil stated that at approximately 2:00 p.m. on October 16, 1983, appellant stopped by a billboard he was painting and told him to "come to her house at

midnight because Jim would be asleep and he would not know that we were meeting." Appellant denied ever visiting Reil while he was working.

accused is charged. *Harris v. State,* 645 S.W.2d 447, 456 (Tex.Crim.App.1983). Mere presence at the scene of the offense will not compel the conclusion that the witness is an accomplice witness. *Easter v. State,* 536 S.W.2d 223, 227 (Tex.Crim.App. 1976). Also, the fact that a person who is present when a crime is committed fails to give an alarm, fails to inform on a person he knows to have committed a crime, or conceals his knowledge that a crime has been committed does not make him an accomplice. *Brown v. State,* 640 S.W.2d 275 (Tex.Crim.App.1982); *Easter,* 536 S.W.2d at 227. It is only when the evidence clearly shows that the witness is an accomplice witness as a matter of law that the trial court has a duty to so instruct the jury. *Arney v. State,* 580 S.W.2d 836 (Tex.Crim. App.1979); *Allen v. State,* 461 S.W.2d 622 (Tex.Crim.App.1970); *Gonzales v. State,* 441 S.W.2d 539 (Tex.Crim.App.1969). If there is a *conflict in the evidence* the court should charge the jury on the question of whether the witness was an accomplice *as a matter of fact. Brooks v. State,* 686 S.W.2d 952, 957 (Tex.Crim.App.1985).

The main question here is whether there was sufficient evidence to show that Reil took part in the planning or commission of the shooting death of James Keech. *See Noack v. State,* 658 S.W.2d 243, 248 (Tex. App.—Houston [1st] 1983, pet. ref'd). We find no conflicting testimony as to Herbert Reil's participation in this murder.

**2.** Appellant's neighbor, Gary Smith, testified that at approximately midnight on October 16, he and his wife saw a car drive up and park at the Keeches. Shortly thereafter he heard a metallic sound, as if someone were going through the Keeches' gate to the side of the house. Smith's son, Thomas P. Smith, testified that he arrived home at approximately 12:10 a.m. that evening and noticed a car parked in the grass at the Keeches which fit the description of the car Reil was driving. In his written statement, Reil testified that earlier that day, appellant had told him "to go to the side door of the house and knock twice because she would be in the kitchen. I pulled in the driveway and parked my car in the grass. I went through the gate and went to the side door. Lynn was waiting at the door for me." Appellant testified at trial that one must go through the gate to get to the side door of her house.

There is no evidence of a plan or scheme by Reil and appellant to shoot and kill appellant's husband; there is, however, evidence of Reil's absence when Keech was shot. The record shows, through Reil's testimony, that he arrived at the Keech house around midnight on October 16, 1983, after appellant had shot and killed her husband. Other witnesses testified that they noticed Reil's car parked at the Keech residence around midnight that night.[2] This evidence also corroborates the chief medical examiner's testimony placing the time of James Keech's death between 11:00 p.m. and 2:00 a.m.

Appellant told police investigators a story which was consistent with her alleged comment to Reil that she would make the shooting look like a burglary. The evidence, however, was inconsistent with the theory of burglary. Chief Medical Examiner Dr. DiMaio testified that there was no evidence of a struggle with the deceased; there were no bruises on the body, and no injuries to the arms or hands. In addition, Dr. DiMaio testified that because of the type of wound, the gun would have been placed in "hard contact" with the back of the neck (i.e., the muzzle of the gun was pushed hard against the skin to form a tight seal at the time of discharge); other evidence indicated the victim was shot while lying down, was rolled off the bed onto his back, and approximately one to two hours later was turned over onto his stomach.[3] Finally, there was no evidence

**3.** Appellant testified that she awoke shortly after 1:00 a.m., was in the children's bedroom for 30–40 minutes and fled to the neighbor's house before 2:00 a.m. She testified that she last saw her husband alive around 1:15 a.m. and never heard a shot fired. The police found the body lying face down at approximately 2:15 a.m. Appellant's testimony conflicts with Dr. DiMaio's testimony that the *livor mortis* or settling of blood present in the victim's back indicated that he would have been lying on his side or back for one to two hours *after death, prior to being turned* onto his stomach, face down. Investigating Officer Hopper opined that the victim was killed and moved within the confines of the master bedroom; he stated that it would not have required a big person to flip the victim over from the bed to the floor and "could probably push him off fairly easier than picking him

of a forced entry into the home, and no indication that a burglary had occurred.

Reil's participation here is very similar to that of witnesses in *Robinson v. State*, 656 S.W.2d 111 (Tex.App.—San Antonio 1983, pet. ref'd). In that case, two witnesses, Garrett and Murphy, were with the appellant the evening before the commission of the offense; they accompanied appellant to the scene of the murder, and the evidence showed that they returned to Murphy's house to rid the car of bloodstains and cover up evidence of the killing. They did not report the offense. However, the court found that their actions did not make them accomplices. *Robinson*, 656 S.W.2d at 119. When confronted by the investigating officers in the case, both witnesses went to the police station and gave statements, but were not charged in the case.

■ Reil admitted that he destroyed evidence and withheld information related to the shooting. This, however, occurred after the shooting, and under those circumstances, was not sufficient to establish that Reil was an accomplice either as a matter of fact or as a matter of law. *King v. State*, 653 S.W.2d 913, 917 (Tex.App.—Corpus Christi 1983, no pet.). Appellant denied shooting her husband and did not implicate Reil as an accomplice nor give evidence rising to a level to present a fact question as to Reil being an accomplice; the evidence on the whole did not give rise to the question of Reil being an accomplice. When it is clear from the evidence that the witness was not an accomplice, no charge need be given to the jury either that the witness is an accomplice as a matter of law or that the jury is to decide whether the witness is an accomplice. *Villarreal v. State*, 576 S.W.2d 51 (Tex.Crim.App.1979). Appellant's first and second grounds of error are overruled.

In her third ground of error, appellant claims that the evidence was insufficient to prove the offense charged. In reviewing the sufficiency of the evidence, an appellate court looks at all the evidence in the light most favorable to the verdict or judgment and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455 (Tex.Crim.App.1984).

Moreover, the jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony. A jury is entitled to accept one version of the facts and reject another or reject any of the witnesses' testimony. *Penagraph v. State*, 623 S.W.2d 341 (Tex.Crim.App.1981); *Barros v. State*, 661 S.W.2d 337 (Tex.App.—Corpus Christi 1983, no. pet.).

■ The State presented sufficient proof of the requisite mental state to convict appellant of the murder. In addition to the evidence discussed above, Shirley "Charley" Packard, a former employee of the Keeches, testified that while working at the Starlight Lounge she heard appellant tell the deceased "You're worth more to me dead than alive." Packard also testified that she saw appellant and her husband fight occasionally, and that during the summer of 1983, while James Keech was out of town, appellant telephoned Packard and asked her to close the lounge so that she could be with Reil. Packard stated that appellant told her "there had been an attraction between them before." The State also introduced evidence that at the time of the murder, the Keeches were four to five months behind on their mortgage payments, were threatened with having their electricity and utilities turned off, and that there were approximately $175,000 worth of life insurance policies on the life of James Keech, which named appellant as the beneficiary of those policies.

Appellant asserts that the State did not offer proof that appellant possessed the requisite mental state necessary to be convicted of murder, but that the State merely introduced evidence of self-defense and thereafter failed to disprove self-defense;

---

up and moving him." The deceased was six feet one inch tall and weighed 207 pounds; appellant is five feet eight inches tall and weighs 170 pounds.

as a result, under the holding in *Palafox v. State*, 608 S.W.2d 177 (Tex.Crim.App.1980), appellant is entitled to an acquittal. We disagree.

Appellant asserts error on the basis of Herbert Reil's testimony, the pertinent parts of which are as follows:

Q: Did she (Appellant) say anything to you about how he had gotten that way? [i.e., the body of James Keech lying on the bedroom floor.]

A: Yes, sir.

Q: What did she say?

A: That he (James Keech) had gotten angry and threatened to kill her, had gotten the gun, and they fought over it and she shot him.

Q: Did she ask you to do anything?

A: Yes, sir.

Q: What did she ask you to do?

A: To help her out. To take the gun, get rid of it.

Q: Did she tell you anything that she was going to do?

A: Yes, sir.

Q: What did she say?

A: Make it look look a burglary. I told her she should call the police if it was an accident, and she begged me not to get the police in on it—take the gun, because nobody would believe her.

On cross-examination, the following testimony was elicited from Reil:

Q: What did you understand?

A: That he had gotten angry, had gotten the gun, had threatened to kill her, she had shot him.

Q: Did she tell you what he had gotten angry over?

A: No, she hadn't.

It is a well-settled rule that where the State puts into evidence the statements of the accused party which exculpates the accused, and does not directly or indirectly disprove them, the accused is entitled to an acquittal. *Palafox*, 608 S.W.2d at 181. It is also well-settled that the State is not bound by exculpatory testimony of witnesses brought out on cross-examination. *Lee v. State*, 496 S.W.2d 616 (Tex.Crim.App. 1973).

■ To invoke the *Palafox* rule, the appellant must first admit to committing the acts which constitute the gravamen of the offense. Second, the court must determine whether the statements alleged to be exculpatory are such as would clear or tend to clear the accused from fault or guilt. *See Brown v. State*, 475 S.W.2d 938, 955 (Tex. Crim.App.1971). Third, it must appear that the State has not refuted the exculpatory statement. *See Medina v. State*, 164 Tex. Cr.R. 16, 296 S.W.2d 273, 274 (1956).

Appellant testified at trial that she did not kill her husband. Where the accused makes no admission of guilt, the *Palafox* rule may not be invoked. *Rogers v. State*, 687 S.W.2d 337 (Tex.Crim.App.1985); *See Dixon v. State*, 128 Tex.Cr.R. 584, 83 S.W.2d 328, 330 (1935).

■ The denial of the offense by appellant bars her claim for relief under the *Palafox* rule. However, notwithstanding her denial and assuming that Reil's testimony regarding appellant's statement to Reil that she accidentally killed her husband is considered an exculpatory admission, the State has sufficiently refuted appellant's admission to Reil. First, "[t]he conflicts in appellant's versions of the shooting are circumstances tending to show guilt." *Pope v. State*, 505 S.W.2d 556, 557 (Tex.Crim. App.1974). The evidence reveals that appellant told Reil the killing was an accident, yet she told the police investigators, and testified at trial, that a burglary had occurred; appellant also testified that she did not shoot and kill her husband, but last saw him alive shortly after 1:00 a.m. on the evening of his death. Second, the medical examiner's testimony totally rebuts appellant's trial testimony, and is entirely inconsistent with the scenario testified to by Reil of appellant's struggle for the gun resulting in an accidental killing. Finally, as a result of the evidentiary inconsistencies between appellant's testimony and the testimony of other witnesses, together with Dr. DiMaio's testimony, the State sufficiently met its burden to refute appellant's state-

ment to Reil. *See Thompson v. State,* 621 S.W.2d 624, 628 (Tex.Crim.App.1981). Appellant's third ground of error is overruled.

In her fourth ground of error, appellant contends that the trial court erred in not granting her request for a charge on the lesser included offense of voluntary manslaughter. Appellant asserts that Herbert Reil's recitation of her statements regarding her struggle with her husband over the gun showed that if she was guilty, she was guilty only of voluntary manslaughter.

■ In order to require a charge on a lesser included offense, a two-part test must be met: (1) the lesser included offense must be included within the proof necessary to establish the charged offense; and (2) there must be evidence in the record that if the defendant is guilty, he is not guilty of the charged offense, but only of the lesser offense. *Salinas v. State,* 644 S.W.2d 744 (Tex.Crim.App.1983). *See* TEX. PENAL CODE ANN. §§ 19.02, 19.04 (Vernon Supp.1979).

■ The appellant denied killing her husband; such denial precludes her claim that she should have been entitled to a charge that she caused the death of her husband "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.-04(a) (Vernon Supp.1979). Additionally, there was no testimony presented at trial which would indicate appellant became so angry, enraged, resentful or frightened that rendered the mind "incapable of cool reflection." § 19.04(c). Unless there is evidence that the killing occurred "under the immediate influence of sudden passion arising from an adequate cause," appellant is not entitled to a charge on voluntary manslaughter. *Bradley v. State,* 688 S.W.2d 847, 852 (Tex.Crim.App.1985); TEX. PENAL CODE ANN. § 19.04 (Vernon Supp. 1979). Appellant relies solely on the statement of Herbert Reil (previously set out in this opinion), offered by the State, as evidence of the lesser included offense of voluntary manslaughter. Reil's statement is no such evidence. We overrule appellant's fourth ground of error.

Appellant also claims that the trial court erred in permitting the State's attorney to ask "have you heard" questions to witnesses regarding appellant's reputation over appellant's objections.

On cross-examination, the State's attorney asked each of four witnesses whether they had heard that the appellant had at one time tried to hire someone to kill her husband.

■ The State complains that this ground of error is multifarious, citing *Euziere v. State,* 648 S.W.2d 700 (Tex.Crim. App.1983) and *Stein v. State,* 514 S.W.2d 927 (Tex.Crim.App.1974). In both of those cases, the appellant objected to several different statements made by the prosecutor in one ground of error, whereas in this case, appellant objects to the same question posed to four different witnesses; the same error is asserted within each statement. Appellant's fifth ground of error is not, therefore, multifarious.

Although appellant's assertion of error is not multifarious, we do not find the State's question was improper.

It is well-settled that in cross-examining a *reputation* witness, the State is permitted to ask such witness if he has heard of a specific act of misconduct of the defendant, but the question may not be framed so as to imply that the act has actually been committed. *Henderson v. State,* 617 S.W.2d 697, 699 (Tex.Crim.App.1981).

Appellant claims that her reputation was never placed in issue, yet a search of the record indicates otherwise. On direct examination of four witnesses, Edgar Logsdon, Lupe Yount, Kathleen Ann Dix, and Raymond A. Brown, appellant asked each witness: (1) whether he was familiar with the general reputation of appellant in the community for being a peaceable and law abiding citizen; (2) whether her reputation in the community for truth and veracity was good; and (3) whether her general reputation was good or bad. This questioning clearly placed appellant's reputation in issue.

■ Although it is improper to test the knowledge of a witness who has testified to the good reputation of a defendant for being a peaceable, law-abiding citizen by asking "have you heard" questions concerning the alleged offense for which he is being tried, here the question posed by the State did not concern the offense, albeit the same victim was involved (the offense tried was murder not solicitation of murder), for which appellant was on trial. *Wright v. State,* 491 S.W.2d 936 (Tex.Crim.App.1973).

Even if the State's cross-examination was improper, the contention presented in this ground of error does not comport with the objection voiced at trial. *See Nelson v. State,* 607 S.W.2d 554 (Tex.Crim.App.1980). At trial, though appellant objected to the questions asked by the State, she did not object that the questions were improper as framed, namely, implying that the act had actually been committed. *Henderson,* 617 S.W.2d at 699. On the contrary, appellant objected in the following manner: (1) "I object to any such question, unless the State can come up with some kind of reasonable grounds to show something"; (2) objection "for the same reasons stated earlier"; (3) objection "improper, considering the source"; and (4) "Improper considering where he obtained it." Such objections present nothing for review. Appellant's fifth ground of error is overruled.

■ Finally, appellant complains that police officer Gary Hopper and Texas Ranger Adolfo Cuellar should not have been allowed to testify regarding a pistol-shooting demonstration they conducted at the scene of the offense. Appellant claims that the demonstration was inaccurate and of a prejudicial nature which far outweighed any probative value it might have had in assisting the jury in reaching a fair verdict. We disagree.

At the outset, we find appellant's objection to the handgun demonstration, solely in the form of a motion in limine, without objection at trial, insufficient to preserve error on this ground. *Gonzales v. State,* 685 S.W.2d 47 (Tex.Crim.App.1985). In addition, any objection appellant may have

had to the experiment conducted by Hopper, Cuellar, and other witnesses would have gone to the weight and not to the admissibility of testimony on this point. *Ginther v. State,* 672 S.W.2d 475 (Tex. Crim.App.1984). We overrule appellant's last ground of error.

Appellant's conviction is AFFIRMED.